UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| WYCKOFF FARMS, INCORPORATED, a Washington Corporation,<br><br>      Plaintiff,<br><br> v.<br><br>INDUSTRIAL CONTROL CONCEPTS, INC. d/b/a ICC, INC., a Missouri corporation, ICC NORTHWEST, INC., an Oregon corporation, ICC TURNKEY, INC., a Missouri corporation; ALEX ALEXANDROV, an individual; and MICHAEL NEWMAN, an individual,<br><br>      Defendants. | CASE NO:  4:20-CV-5095-TOR<br><br>FINDINGS OF FACT AND CONCLUSIONS OF LAW |

The Court held a bench trial from July 25-29, 2022.  Daniel M. Weiskopf and Claire Martirosian appeared on behalf of Plaintiff/Counterclaim Defendant. Robert W. Novasky appeared on behalf of Defendants/Counterclaim Plaintiffs.

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 1

1   The Court has reviewed the briefing and the record and files herein, considered the

2   evidence and the parties' arguments, and is fully informed.  Pursuant to Federal

3   Rule of Civil Procedure 52(a), below are the Court's Findings of Fact and

4   Conclusions of Law.  To the extent a finding of fact or conclusion of law is

5   deemed the opposite, the label the Court places on the finding does not control.

6                                        **BACKGROUND**

7        This case concerns various contract disputes regarding the building of a

8   cannabinoid extraction facility.  Plaintiff's second amended complaint raises the

9   following claims: (1) breach of contract, (2) breach of contract – anticipatory

10  repudiation, (3) unjust enrichment, (4) breach of contract – defend and indemnify,

11  (5) fraud, and (6) unfair and deceptive business practices.  ECF No. 82.  Only claim

12  (5) for fraud pertains to the individual Defendants, as well as the ICC Group.  The

13  ICC Group raises the following counterclaims: (1) breach of contract and (2) unjust

14  enrichment – quantum meruit.  ECF No. 17.

15       The Court entered partial summary judgment in favor of Plaintiff on claim (4)

16  for the breach of contract claim for failure to defend and indemnify and has awarded

17  three judgments associated with that claim for related state court litigation.  ECF

18  Nos. 54, 74, 120.

19       On July 12, 2022, the Court held a pretrial conference and ruled on the

20  parties' motions *in limine* and reserved ruling on the parties' witness and exhibit

lists until trial.  ECF No. 147.

A bench trial was held from July 25 to July 29, 2022.  The Court heard testimony from the following witnesses and experts: David Wyckoff, Ryan Coates, Dan Gustafiv, Patricia Westmoreland, Sherri Pierce, David Pierce, Alex Alexandrov, Michael Newman, and Arik Van Zandt.  All witnesses and experts were cross-examined.  The Court also admitted into evidence various exhibits, including five deposition transcripts.  The Court overrules Defendants' objection to the introduction of David E. Kekec's deposition.  Pursuant to Federal Rule of Civil Procedure 32(a), Defendant's counsel attended the deposition by videoconference, had the opportunity to cross-examine, and the witness resides more than 100 miles from the Court.  Thus, those portions of his deposition designated by Plaintiff are admitted.  Having considered all the foregoing evidence, the Court now issues the following Findings of Fact and Conclusions of Law.

## DISCUSSION

## I.    FINDINGS OF FACT

A number of facts were stipulated by the parties in the Joint Pretrial Statement (ECF No. 151).  Those facts are accepted by the Court without further proof.  The remaining findings of fact are based on evidence presented at trial. Each finding that is not stipulated to is based on a preponderance of the evidence standard, unless otherwise stated.

1. Wyckoff Farms Incorporated ("WFI") is a farming and crop processing company based out of Grandview, Washington.  For over six decades, WFI has farmed, processed, and packaged a variety of crops at its properties in Eastern Washington.

2. David Wyckoff, CEO of WFI, has worked in agriculture for approximately 47 years.  Mr. Wyckoff has a *juris doctor* degree and practiced law before working at WFI, the Wyckoff family business.

3. Industrial Control Concepts ("ICC") manufactures stainless steel tanks and provides engineering services for various industries, including distilling and brewing, food and beverage, and hemp and CBD.  ICC has offices in Oregon, Honolulu, Illinois, Missouri, and South Carolina.

4. In 2019, WFI sought to construct a cannabinoid extraction plant in Prosser, Washington ("the Project").

5. WFI and ICC entered into multiple agreements regarding the Project.

6. On or about May 17, 2019, the parties executed an agreement for the purchase of 22 tanks and tank-related equipment for a fixed fee of $876,000 (the "Tank Contract").  No damages are sought regarding the Tank Contract.

7. Wyckoff paid ICC $876,000 under the Tank Contract.

8. On or about June 14, 2019, the parties executed an agreement for process engineering of the Project (the "Engineering Contract").  ICC agreed, for a

fixed fee of $212,000 and reasonable out of pocket travel expenses. Wyckoff paid ICC $212,000 under the Engineering Contract.   No damages are sought regarding the Engineering Contract.

9.   On or about August 9, 2019, the parties executed an Interconnection Piping Build/Install contract (the "Piping Contract").  ICC agreed to provide final design/fabrication, delivery, and installation of certain "interconnection" piping for (1) a fixed fee of $368,000; and (2) a non-binding estimate of T&M (Time and Materials) of $110,000 to $125,000 plus travel expenses with a not to exceed $135,000 for the contract scope unless agreed to prior.

10.  On or about August 19, 2019, the parties executed a Controls Build/Install contract for the Project (the "Controls Contract").  The Controls Contract provided for: (1) a fixed fee of $801,000; (2) a non-binding estimate for time and travel costs for install of $115,000 to $135,000 with a not to exceed of $140,000 for the contract scope unless agreed to prior; (3) a non-binding estimate for commissioning and start up engineering time and travel costs of $42,000 to $48,000 with a not to exceed $54,000 for the contract scope unless agreed to prior.

11.  WFI paid ICC $600,750 under the fixed fee portion of the Controls Contract.

12. On October 9, 2019, ICC represented it had identified missing equipment currently not supplied by any other vendors under contract and certain other work not covered by the prior agreements between ICC and WFI.  ICC told WFI that WFI needed to execute a contract to "close the gaps" so that the project could be completed.

13. On October 9, 2019, WFI and ICC executed the Gap Closure Build/Install Contract (the "Gap Contract").  Included with the Gap Contract was a highlighted P&ID that ICC claimed represented its understanding of existing scope ownership and the remaining gap scope to be addressed.  ICC agreed to provide the scope changes and gap closure for (1) a fixed fee of $1,638,195; and (2) estimated T&M costs covering "commissioning and install labor time" of $922,572 plus travel costs.

14. The Gap Contract allowed for overtime to reduce schedule timeline regarding mechanical and electrical installation, at a cost to WFI.  No other contract contained a provision for overtime.

15. WFI paid $1,638,195 under the fixed fee portion of the Gap Contract.

16. The Engineering Contract, Piping Contract, Controls Contract, and Gap Contract all incorporate the same Appendix 1, General Terms and Conditions ("Terms and Conditions").

17. The Terms and Conditions provide, among other things, that:

a. "Agreements reached and/or contracts issued as a result of acceptance of all or part of this proposal by the Client or the Client's authorized representative(s) may be terminated upon thirty (30) days written notice by either party."

b. "Cancellation with immediate effect is justified if the other party is adjudged bankrupt, suspends his payments, or in any other way becomes incapable of fulfilling his obligations."

c. Time and Materials (T&M) billings were to be "invoice[ed] to [WFI] at the end of each calendar month and shall include the supporting detail of time sheets and vendor invoices as relevant."

d. "At [WFI's] request, invoice line items for expense reimbursement shall include copies of receipts for expenses incurred that are above $25."

18. The Project involved an interactive process where changes occurred in the scope of projects and such changes were accommodated in T&M billings, the Gap Contract, and Change Orders. These changes materially impacted the Project timeline and expense. WFI purchased equipment from other suppliers directly, including Thar, Deutsche, and others. Delays in shipping and configuration caused the P&IDs to change, which also caused delays and extra expenses. The Court finds that the change orders and increased

price were due to a "moving target" created by various equipment suppliers, by WFI's desires and changes, the failure to fully provide timely P&IDs to ICC, and the new technology and unusual nature of the project.

19. On January 3, 2020, ICC and WFI agreed to Change Order No. 1 regarding additional scope for ETOH liquid overflow design, equipment, and installation changes.  ICC charged WFI a fixed cost of $132,074, with $99,054.79 payable upon signing and $33,018.26 payable upon completion of the installation.

20. WFI paid ICC $99,054.79 for Change Order No. 1.

21. After the Gap Contract was signed, WFI learned, and ICC readily admitted, that ICC had charged WFI in the Gap Contract for certain items that had been covered by the Tank Contract or otherwise were not within the Gap Contract scope.  ICC claimed these charges were mistakes and would credit WFI for these overcharges.

22. ICC hired certain subcontractors to perform the work required under the various contracts.  ICC had full control and responsibility for the payment to those subcontractors and the work performed by those subcontractors.  One such subcontractor was NIPR, ICC's subcontractor for piping.  Another subcontractor was Lakeshore Electric, ICC's subcontractor for electrical work on the Project.

23. At times, ICC failed to timely pay equipment vendors for equipment for which WFI had already paid ICC.  At times, ICC also failed to pay its subcontractors for work done on the WFI project.

24. In early March 2020, despite the fact that WFI was current on all payments owed to ICC, ICC was not timely paying NIPR.  As a result of the nonpayment by ICC, NIPR reduced the work force on the Project and threatened to stop work entirely.

25. On March 13, 2020, WFI directly paid NIPR $113,375.  This payment was ICC's responsibility.  WFI took on ICC's obligation to NIPR for this payment so that NIPR would continue work on the Project.

26. Approximately two weeks later, ICC again failed to pay its subcontractors, including NIPR and Lakeshore Electric.  As of March 26, 2020, Lakeshore Electric would no longer work with ICC due to nonpayment by ICC.  As of April 4, 2020, NIPR stopped work on the Project due to nonpayment by ICC.

27. As of March 2020, certain equipment for which WFI had paid ICC under the Gap and Controls Contracts had not yet been delivered to the site.

28. In April 2020, as the scope of work continued to be evaluated and altered, ICC submitted certain additional change orders to WFI.  ICC estimated that these change orders would require WFI to pay an estimated $892,000 in

additional T&M payments to complete the Project.  ICC does not seek damages in connection with the proposed but not agreed upon $892,000 change orders.

29. As of early April 2020, neither ICC nor subcontractors were working on the Project.  In addition, certain equipment for which WFI had paid ICC under the Gap and Controls Contracts had not yet been delivered to the site.

30. WFI requested an explanation from ICC as to (i) its non-payment of subcontractors and the non-delivery of equipment, (ii) ICC's outstanding proposed change orders, and (iii) its capability to timely finish the Project.

31. On April 5 and 6, 2020, WFI sought ICC's financial statements, including ICC's current position, pending payables, receivables, and other disagreements that could adversely affect ICC's current position or ability to complete the project for WFI.

32. On April 7, 2020, ICC communicated to WFI that it would not provide financial statements on the grounds that as a private company, ICC does not provide financial statements to third parties.  ICC directed WFI to review payable and open balances relevant to the project in the reconciliation documents.  ICC communicated to WFI that if it was still insecure, that ICC was "fully open to discussing using an instrument, such as a letter of credit, payable at sight upon delivery of deliverables and confirmation of such

delivery by an independent inspector."

33. On April 14, 2020, WFI notified ICC that it did not believe ICC provided satisfactory information regarding WFI's demand for assurance of performance.  Specifically, WFI stated that it did not believe ICC could perform on the contracts on the grounds that subcontractors were not on site and ICC did not have replacement personnel for one week, past due payments to subcontractors, at least one subcontractor indicated it was not willing to work with ICC, the failure to provide the requested financial information including a letter of credit, the increase of change orders and invoices without prior approval, lack of management and accounting, and double billing.

34. On April 14, 2020, WFI notified ICC that it was terminating the contracts.

35. WFI hired other contractors to finish the Project (including Lakeshore Electric).

36. The Gap Contract, Controls Contract, and Change Order No. 1 were not completed by ICC or its subcontractors.

37. WFI presented credible evidence that the value of the equipment delivered to WFI under the Gap and Controls Contract was $215,143.95.  When applying a 15% markup for ICC, the total equipment value is $247,415.54.

38. WFI presented credible evidence that it received $63,285 in value for engineering services under the Gap and Controls Contract. The engineering services were calculated at 25% of the total equipment value. Thus, the evidence supports a finding that $310,700.54 in value was provided by ICC for equipment and engineering services under the Gap and Controls Contracts. While ICC claimed that a higher value of equipment and engineering services were provided, it did not prove so by a preponderance of evidence.

39. WFI presented credible evidence that it received $33,000 in value for Change Order No. 1. While ICC claims that the entire change order was completed for a value of $132,000, it presented no evidence to support this proposition.

40. WFI paid ICC $1,037,126 for T&M payments across all of its contracts with ICC.

41. Patricia Westmoreland, WFI's expert witness, conducted an analysis of ICC and NIPR's invoices, timecards, and backup information and concluded that ICC had been overcharged by $363,905.50 for T&M work (noting $385,740 in contested charges which includes $21,834 in interest, amounting to $363,905.50 if interest charge removed.) This number includes:

a.  $90,619.75 in belated and impermissible overtime billings in violation of the Terms and Conditions and the agreed billing rates.  The overtime billings are not related to the mechanical and electrical installation under the Gap Contract. As a result, this amount was improperly billed.

b.  $138,351.57 in other billing irregularities, including areas in which ICC or NIPR either overbilled for their work or failed to document their work as well as their expenses, including airfare, gas, mileage, and purchased materials, in violation of the Terms and Conditions. Based on the preponderance of the evidence and a lack of any evidence from ICC countering this testimony of WFI (David Pierce and Ms. Westmoreland), these billings were improper.

c.  $134,934.25 in expenses associated with timecards for ICC's subcontractors that were not signed by any ICC supervisor, making it impossible for WFI to know whether the work billed for had actually been completed.  David Pierce testified that while some timecards were not signed, he did not dispute that subcontractors were on site and working, and he did not have an issue with the subcontractors' work.  As a result, WFI has not shown by a preponderance of the evidence that these amounts were improperly billed.

42. The Court finds Ms. Westmoreland credible.  The Court finds that based on the testimony and evidence, ICC was required to provide subcontractor work at a set rate, and ICC managed workflow, and that ICC was responsible for paying subcontractors amounts above the agreed rate, including higher hourly rates for applicable overtime.  However, as stated above, the Court also finds based on the testimony and evidence that amounts were properly deducted for impermissible overtime billings and billing irregularities, but the amounts for the timecards were improperly deducted based on improper or missing documentation.  Accordingly, the Court finds by a preponderance of the evidence that WFI was overbilled by $228,971.32.

43. On March 30, 2020, ICC provided WFI with two invoices purporting to cover March 2020 work amounting to $526,620.65 in total.  WFI has not paid those invoices.

44. On December 24, 2020, ICC provided WFI with an additional invoice in the amount of $134,188.63 purporting to cover work through May 1, 2020. WFI has not paid this invoice.  The contracts required billing at the end of the month, not months after the fact.

45. WFI paid Lakeshore Electric $112,800 for work represented on ICC's March 30, 2020 invoices to WFI.

46. NIPR sued ICC and WFI in an action captioned *NIPR, LLC v. Industrial Control Concepts, Inc., et. al.*, Benton County Case No. 20-2-01235-03 (the "Benton County Action") in connection with ICC's failure to pay NIPR for NIPR's work on the project. On October 8, 2021, the Benton County Court entered final judgment for NIPR against WFI in the amount of $294,656, exclusive of interest and fees. As of October 8, 2021, the total amount of the judgment was $397,283.82, including interest and fees.

47. This Court has found that ICC has an obligation to defend and indemnify WFI in connection with the judgment. ECF No. 37. ICC admits its obligation to pay this judgment. ECF No. 133 at 3-4.

48. Arik Van Zandt, ICC's expert witness, conducted an analysis of ICC and NIPR's invoices, timecards, and backup information and concluded that ICC owed WFI $71,376. Mr. Van Zandt's analysis was based in large part on evidence not in the record, and to the extent that Mr. Van Zandt relied on information provided to him by ICC employees that was not provided to the Court, the information is disregarded by the Court.

49. ICC claims it properly submitted $2,172,897 in invoices for T&M but provided no evidence that all this work was performed. WFI's damage calculation and testimony inherently concedes that $1,697,955 was billed. Accordingly, ICC's claims are rejected for lack of a preponderance of

evidence.

50. ICC claims it properly delivered $794,769 in equipment and engineering, $119,215 for its margin on equipment, and $482,150 for engineering and design services on change orders that were not agreed upon by the parties. ICC has not provided evidence that this equipment and work were performed and that the change order was agreed upon by the parties. Accordingly, these claims are rejected for lack of a preponderance of evidence.

51. ICC's counterclaims for breach of contract and unjust enrichment – quantum meruit have not been proven by a preponderance of the evidence.

52. Mr. Van Zandt concluded that Ms. Westmoreland's application of 6% percent interest rate was high, considering the historically low interest rate during the applicable period. The Court accepts this finding and deducts the interest rate from her calculations.

## II.    CONCLUSIONS OF LAW

This Court has original jurisdiction of this lawsuit under 28 U.S.C. § 1332 because it is a civil action between citizens of different states and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

### A.  Breach of Contract

1. The plaintiff must show (1) the existence of a valid contract, (2) breach of

the contract, and (3) resulting damages. *Lehrer v. State, Dep't of Social & Health Servs.*, 101 Wash. App. 509, 516 (2000).

2.  "Only a breach or nonperformance of a promise by one party to a bilateral contract so material as to justify a refusal of the other party to perform and contractual duty, discharges that duty." *DC Farms, LLC v. Conagra Foods Lamb Weston, Inc.*, 179 Wash. App. 205, 220 (2014) (internal citation omitted).

3. "A material breach is one that substantially defeats a primary function of the contract." *Line Builders, Inc. v. Bovenkamp*, 179 Wash. App. 794, 808 (2014).

4. Under the Terms and Conditions applicable to all contracts, WFI had the right to terminate the contracts either (i) upon 30-days' notice for any reason; or (ii) immediately if ICC was "adjudged bankrupt, suspend[ed] [its] payments, or in any other way bec[ame] incapable of fulfilling [its] obligations."

5. ICC was never adjudged bankrupt.  However, ICC suspended payments to subcontractors, they walked off the job, and ICC became incapable of timely fulfilling its obligations under the contracts.  Therefore, ICC was in breach of the unfulfilled contracts.

6. WFI analyzed the amounts it paid to ICC for which WFI did not receive

value from ICC, offset against any payments properly owing from WFI to ICC.  The method for calculating damages was not disputed by ICC.

7.  WFI paid ICC $1,638,195 for the fixed portion of the Gap Contract, $600,750 for the fixed portion of the Controls Contract, and $99,054 towards Change Order No. 1, for a total amount of $2,337,999.

8.  WFI received $310,700.54 worth of equipment and engineering on the Gap and Controls Contracts.  WFI received $33,000 worth of work on the Change Order No. 1.  Thus, ICC is required to return $1,994,299.

9.  WFI paid ICC $1,037,126 for T&M payments across all of its contracts with ICC.  A preponderance of the evidence shows that WFI was overcharged by $228,971.32.  Thus, ICC is required to return that $228,971.32.

10. WFI paid $112,800 directly to Lakeshore Electric in connection with work represented on ICC's March 2020 invoice to WFI.  Because WFI paid this directly, this amount must be deducted from ICC's outstanding invoices.

11. ICC invoiced WFI for $1,697,955 for T&M charges.  WFI paid ICC $1,037,126 for T&M payments across all of its contracts with ICC.

12. As a result, $660,829 of ICC's invoices remain unpaid by WFI.

13. ICC is entitled to the payment (offset) for the value of the remaining T&M services it provided to WFI for which it has not already received payment.

That amount is $413,840.37, which is $1,697,955 offset by:

    a.  $1,037,126 in payments already made by WFI;

    b.  $112,800 that WFI paid directly to Lakeshore Electric; and

    c.  $134,188.63 in connection with ICC's untimely December 24, 2020 invoice.

14. There is also no dispute that ICC is also responsible to pay (1) the amount due of the NIPR Judgment ($397,283, including interest and fees). Additionally, ICC is responsible for paying the three partial summary judgments entered by this Court. ECF Nos. 54, 74 and 120.

15. As a result, WFI is entitled to an award in the amount of $1,809,429.95 ($2,223,270.32 minus $413,840.37 for unpaid T&M) in connection with ICC's breach of contract. Additionally, ICC owes the amounts of the NIPR Judgment in Benton County and the partial summary judgments entered by this Court at ECF Nos. 54, 74, 120.

16. Prejudgment interest may be awarded when the claim is liquidated. *Safeco Ins. Co. v. Woodley*, 150 Wash. 2d 765, 773 (2004) (citing *Prier v. Refrigeration Eng'g Co.*, 74 Wash. 2d 25 (1968)). A claim is liquidated "where the evidence furnishes data which, if believed, makes it possible to compute the amount with exactness, without reliance on opinion or discretion." *Prier*, 74 Wash. 2d at 32 (citing Charles T. McCormick,

1    Handbook on the Law of Damages § 54 (1935)).  A claim is unliquidated "

2    'where the exact amount of the sum to be allowed cannot be definitely fixed

3    from the facts proved, disputed or undisputed, but must in the last analysis

4    depend upon the opinion or discretion of the judge or jury as to whether a

5    larger or a smaller amount should be allowed.'"  *Hansen v. Rothaus*, 107

6    Wash. 2d 468, 473 (1986) (quoting *Prier*, 74 Wash. 2d at 33).  Here, the

7    claims are unliquidated, a portion of the amounts owed are offsetting and

8    thus, no prejudgment interest will be allowed.

9    17. The Court need not address WFI's alternative theories of anticipatory

10    breach and unjust enrichment as it would result in the same damages

11    analysis.  Repudiation by a contracting party requires "a clear and positive

12    statement or action that expresses an intention not to perform the contract."

13    *Versuslaw, Inc. v. Stoel Rives, LLP*, 127 Wash. App. 309, 320-21 (2005).

14    Here the Court has found a breach of contract, not an express repudiation

15    constituting of an  anticipatory breach.

16    18. Likewise, WFI's claims for lack of good faith and fair dealing do not add

17    anything to the equation.  Although there is a duty of good faith and fair

18    dealing implied in all existing contracts, we have consistently held there is

19    no "free-floating" duty of good faith and fair dealing that is unattached to an

20    existing contract.  *Keystone Land & Dev. Co. v. Xerox Corp.*, 152 Wash. 2d

171, 177–78 (2004) (citation omitted); see also *Wallace Real Estate Inv., Inc. v. Groves*, 124 Wash. 2d 881, 898 (1994).  The duty exists only "in relation to performance of a specific contract term." *Id*.  Having found a breach, the Court need not further discuss this issue.

**B.  Consumer Protection Act**

1.  The Washington Consumer Protection Act ("CPA") prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  RCW 19.86.020.  "Any person who is injured in his or her business or property by a violation of RCW 19.86.020 … may bring a civil action" to recover actual damages.  RCW 19.86.090.

2.  To prevail on a non-*per se* CPA claim, "the plaintiff must prove an (1) unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) public interest impact; (4) injury to plaintiff in his or her business or property; [and] (5) causation." *Klem v Washington Mut. Bank*, 176 Wash. 2d 771, 782 (2013) (quoting *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wash. 2d 778, 780 (1986)).

3.  Under the first element, the plaintiff can demonstrate a deceptive act if the "alleged act had the capacity to deceive a substantial portion of the public" even if there was no intent to deceive. *Merriman*, 198 Wash.

App. 594, 628 (quoting *Hangman Ridge*, 105 Wash. 2d at 785); see also

*Klem*, 176 Wash. 2d at 784-88.  The plaintiff can demonstrate an unfair

act if the act "(1) causes or is likely to cause substantial injury which (2)

consumers cannot avoid, and (3) is not 'outweighed by countervailing

benefits.'"  *Merriman*, 198 Wash. App. at 628 (quoting *Klem*, 176 Wash.

2d at 787).  Whether an act constitutes an unfair or deceptive practice is a

question of law.  *Columbia Physical Therapy, Inc., P.S. v. Benton*

*Franklin Orthopedic Assocs., P.L.L.C.*, 168 Wash. 2d 421 (2010).

4. The first element is not satisfied by the allegation that ICC's practice of

"pulling forward" cash to use WFI funds to pay for other debts and not

for the purpose of this project has the capacity to deceive a substantial

portion of the public even if there is no intent to deceive.  While ICC may

have been under capitalized, the funds and contracts did not indicate that

the funds were to be put "in trust" only for the benefit of this project.

Businesses often use receipts for expenses, overhead, and other liabilities.

That fact alone does not mean ICC committed an unfair or deceptive act

or practice within the meaning of the CPA.

5. Under the second element, "trade" and "commerce" are defined to

"include the sale of assets or services, and any commerce directly or

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 22

indirectly affecting the people of the state of Washington." RCW

19.86.010(2).

6.  The second element is satisfied as the Project included the sale of
    equipment and services.

7.  Under the third element, "[o]rdinarily, a breach of a private contract
    affecting no one but the parties to the contract is not an act or practice
    affecting the public interest." *Hangman Ridge*, 105 Wash. 2d at 790.
    However, a plaintiff can establish that the private "lawsuit would serve
    the public interest by showing a likelihood that other plaintiffs have been
    or will be injured in the same fashion." *Trujillo v. Nw. Tr. Servs.*, 183
    Wash. 2d 820, 835 (2015) (internal citations omitted). To assess the
    public interest in a private dispute, courts are guided by "(1) whether the
    defendant committed the alleged acts in the course of his/her business,
    (2) whether the defendant advertised to the public in general, (3) whether
    the defendant actively solicited this particular plaintiff, and (4) whether
    the plaintiff and defendant have unequal bargaining positions." *Id.* at
    836. No one factor is dispositive. *Id.*

8.  The third element is not satisfied. The Project involved various contracts
    between private parties. While ICC committed the breach of contract
    within the course of its business and advertises its services, ICC did not

actively solicit WFI and the parties do not have unequal bargaining positions.  WFI solicited ICC's services and David Wyckoff, the CEO of WFI, has a *juris doctor* degree and practiced law before working in agricultural services for over 47 years.  These sophisticated parties contracted to build an unusual and highly complex processing facility. This lawsuit does not serve the public interest.

9.  Under the fourth and fifth elements, the plaintiff can establish injury and causation by showing "the deceptive act or practice proximately caused injury to the plaintiff's 'business or property.'"  *Panag*, 166 Wash. 2d at 63-64.

10. The fourth and fifth elements are not satisfied as the breach of contract proximately caused the injury to WFI's business or property, not a deceptive act or practice.

11. Based on the failure to demonstrate all five elements, WFI has failed to prove a violation of the CPA.

**C. Fraud**

1.  The nine elements of fraud are: (1) a representation of an existing fact; (2) the fact is material; (3) the fact is false; (4) the defendant knew the fact was false or was ignorant of its truth; (5) the defendant intended the plaintiff to act on the fact; (6) the plaintiff did not know the fact was

false; (7) the plaintiff relied on the truth of the fact; (8) the plaintiff had a right to rely on it; and (9) the plaintiff had damages. *Baertschi v. Jordan*, 68 Wash.2d 478, 482 (1966).  The plaintiff must show every element by clear, cogent, and convincing evidence.  *Id.* at 483.

2.  Plaintiff has stated its intention to withdraw its fraud allegation against the individual Defendants.  ECF No. 138 at 20.

3.  WFI has not satisfied elements six and seven.  WFI has not shown that it did not know any fact was false.  For example, while WFI claims ICC caused payments to be collected that were not due for 30 days, the contracts clearly stated the terms of payment and methods of invoicing.  Because WFI and Mr. Wyckoff were aware of the contract terms, WFI could not have relied on the truth of the purportedly false facts.

4.  Additionally, WFI claims it was double billed for equipment.  As soon as this issue was brought to the attention of ICC, ICC readily admitted Schedule 6 was not accurate, that it made a mistake, and agreed to provide a credit for any double billed equipment.

5.  Based on the foregoing, WFI has failed to prove its fraud claim against ICC by clear, cogent, and convincing evidence.

**D.  Counterclaims**

ICC's counterclaims for breach of contract and unjust enrichment – quantum

meruit have not been proven.  Additionally, in calculating damages, the Court has taken into consideration the amount of benefit WFI received from ICC in determining the proper amounts due.

**CONCLUSION**

Based on the findings of fact and conclusion of law, the Court finds Plaintiff has met its burden on the breach of contract claim, but did not meet its burden on the CPA nor fraud claims.  Therefore, Plaintiff is not entitled to CPA damages, including statutory attorney fees.  Defendants moved to dismiss Plaintiff's CPA claim at the close of Plaintiff's claim pursuant to Federal Rule of Civil Procedure 52.  ECF No. 154.  In light of the Court hearing all of the evidence presented and making a fully informed decision against Plaintiff on the CPA claim, the Court denies Defendants' Rule 52 Motion as moot.

**ACCORDINGLY, IT IS HEREBY ORDERED:**

1.  Defendants' Oral Motion for Judgment on Partial Findings Under Rule 52(c) is **DENIED** as moot.

2.  The Clerk's Office is directed to enter Judgment in Plaintiff's favor on the contract claim and against Defendants ICC, Inc., ICC Northwest, Inc, and ICC Turnkey, Inc., joint and several.  Plaintiff is entitled to damages in an amount of $1,809,429.95 for Defendants' breach of the contracts.

3. Upon entry of the Judgment, interest shall accrue on the unpaid balance at the statutory rate for federal judgments according to 28 U.S.C. § 1961.

4. Additionally, ICC owes the amounts of the NIPR Judgment entered in Benton County and the partial summary judgments already entered by this Court at ECF Nos. 54, 74, 120 (accruing interest as of the dates of their entry).

5. The claims against Defendants Alex Alexandrov and Michael Newman are **DISMISSED** with prejudice.

6.  No attorney fees are awarded, however, costs to the prevailing party, WFI, will be allowed for the breach of contract claim only.  *See* Fed. R. Civ. P. 54(d).

   **IT IS SO ORDERED.**  The District Court Clerk is directed to enter this Order and Judgment accordingly, provide copies to the parties, and **CLOSE** the file.

   DATED September 26, 2022.



                    THOMAS O. RICE
                United States District Judge

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 27